RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 26a0226p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

DANIELLE ARTHUR,

  *Plaintiff-Appellant*,

  *v.*

DOUGLAS KRAUSE,

  *Defendant*,

NOLAN VANDERWEELE, identified on initiating documents as Nolan Vanderwheele; NICHOLAS WEMPLE,

  *Defendants-Appellees*.

┐
│
│
│  No. 25-2123
│
│
┘

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:24-cv-00105—Hala Y. Jarbou, District Judge.

Argued:  July 29, 2026

Decided and Filed:  August 11, 2026

Before:  GILMAN, GRIFFIN, and READLER, Circuit Judges.

───────────────

**COUNSEL**

**ARGUED:**  Solomon M. Radner, RADNER LAW GROUP, PLLC, Southfield, Michigan, for Appellant.  Kendell S. Asbenson, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellees.  **ON BRIEF:**  Solomon M. Radner, RADNER LAW GROUP, PLLC, Southfield, Michigan, for Appellant.  Linda E. Andrzejewski, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellees.

———————————

**OPINION**

———————————

RONALD LEE GILMAN, Circuit Judge.  This case arises from a prison hostage training exercise that left Danielle Arthur, a participating prison employee, with injuries.  In April 2023, Arthur was asked to act as a hostage while a team of corrections officers practiced subduing her mock hostage taker, played by Assistant Deputy Warden Douglas Krause.  During the exercise, the officers accidentally caused Arthur to be pinned against an armchair, resulting in injuries to her left leg.

Arthur subsequently sued Krause and the corrections officers who participated in the exercise, which included Nolan VanderWeele and Nicholas Wemple.  After several years of litigation, Arthur's sole remaining claim is one against VanderWeele and Wemple (collectively, Defendants), alleging excessive force in violation of her Fourth Amendment rights.

In November 2025, the district court granted summary judgment in favor of Defendants, concluding that Arthur had not been subjected to a "seizure" within the meaning of the Fourth Amendment.  Arthur now appeals that ruling.  She also argues that the court abused its discretion in granting summary judgment without first resolving her pending motion for sanctions against VanderWeele for evidentiary misconduct.  For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I.        BACKGROUND

### A.        The hostage training exercise

Arthur was employed as a mental-health professional at the Oaks Correctional Facility in Michigan from June 2022 through May 2023.  On April 18, 2023, Assistant Deputy Warden Krause asked Arthur and Arthur's supervisor, Brian Majerczyk, to participate in a hostage training exercise.  They both agreed.

Krause instructed Arthur to report to Majerczyk's office, where Krause would simulate taking them hostage.  When Arthur arrived, Krause closed the door, covered the office window,

and instructed Arthur and Majerczyk to activate their personal-protection devices. Prison staff carried these devices to request assistance during dangerous situations, and activating them would alert corrections officers to promptly respond.

Two officers, Jared Revolt and Travis Hall, responded to the call. Krause then conducted mock negotiations with them through the closed office door. During the negotiations, Krause held a highlighter pen to Arthur's throat to simulate a knife and uncovered the office window to demonstrate to the officers that her life was purportedly in danger. The negotiations continued for approximately 15 minutes before a rescue team assembled outside the office.

To allow the rescue team to practice breaching the office, Krause informed the officers that Arthur was experiencing a simulated diabetic emergency and that he would release Majerczyk. Four officers wearing cell-extraction gear accordingly gathered outside the office door to conduct the breach. Officer VanderWeele, carrying a transparent shield, served as the lead member of the extraction team. Behind him were Officer Wemple, who was assigned to secure Krause's lower body, Officer Connor Ison, who was assigned to secure Krause's upper body, and Officer John Farago, who was positioned at the rear.

Inside the office, Krause stood in front of a short filing cabinet with armchairs on either side. He positioned Arthur on his right side near one of the armchairs. Krause then instructed Majerczyk to leave the room.

When Majerczyk opened the door, VanderWeele rushed into the office at approximately half the speed that he would have used during an actual hostage incident and advanced toward Krause. At the same time, Wemple moved around VanderWeele's left side and crouched to secure Krause's legs. The rescue team's advance caused Krause and Arthur to be "guided backwards" approximately three feet. Krause also attempted to push Arthur out of the path of VanderWeele's shield, moving her directly in front of the nearby armchair.

VanderWeele then rammed Krause with his shield while Wemple simultaneously grabbed Krause's right knee. This maneuver prevented Krause from stepping backwards, forcing him to lean into Arthur's upper body. Although Arthur attempted to avoid contact, she

had little room to maneuver and was therefore pushed into the armchair.  Several members of the rescue team then "fell slightly" on top of both Krause and Arthur.

Arthur saw only "a flash image of the officers coming into the room" before feeling a "blinding pain" in her left leg as her body was "pinned up against the chair that was behind [her]."  The pain caused her to scream:  "OW, F***, you're on my leg!"  After Arthur cried out, the pressure pinning her to the armchair was immediately relieved.  Krause then promptly ended the exercise.

Once she regained awareness, Arthur found herself seated in the armchair as the other participants looked on, making her feel humiliated.  She soon completed an incident report and then went home for the day.  Several weeks later, an MRI scan revealed that Arthur had suffered a "[l]ow-grade sprain of the posterior cruciate ligament" and "[b]one contusions involving the medial femoral condyle and medial tibial plateau with incomplete impaction fracture."  Arthur's last day at work was on May 17, 2023, and the prison backfilled her position several months later, leaving her unemployed.

After the incident, the prison launched an internal investigation to determine whether the hostage training exercise had violated any Michigan Department of Corrections policy.  Inspector Bill Rushford handled the investigation.  In October 2023, he issued an investigative report finding "[i]nsufficient evidence . . . of any inappropriate physical contact" and concluding that any contact that had occurred was accidental.  The investigation was reopened in March 2024, but Rushford ultimately reached the same conclusion as before.

**B.      Procedural history**

In February 2024, Arthur filed this action against Krause and the other officers who had participated in the hostage training exercise.  After Arthur amended her complaint several times and the district court dismissed a number of her claims, only one remained:  a claim based on 42 U.S.C. § 1983 against VanderWeele and Wemple, alleging that they had used excessive force against her, in violation of her Fourth Amendment rights.

Defendants moved for summary judgment in June 2025.  Two months later, Arthur moved for sanctions against VanderWeele.  Her motion alleged three instances of evidentiary misconduct:  (1) VanderWeele deleted several Facebook messages concerning Arthur that he had exchanged with Officer Clayton Setzer on April 19, 2023, the day after the incident; (2) although VanderWeele had spoken with Setzer about the incident in April 2025, VanderWeele instructed Setzer to falsely testify that they had last spoken in February 2025; and (3) VanderWeele admitted that he had lied during his own deposition when he testified that he had last spoken with Setzer "this past February," even though they had in fact spoken in April 2025.

Arthur's motion for sanctions sought an adverse-inference instruction, the striking of VanderWeele's pleadings, a default judgment against him, and the award of attorney fees and costs.  The district court scheduled a hearing on the motion for December 2025.  In November 2025, however, the court granted Defendants' summary-judgment motion, holding that Arthur's excessive-force claim was without merit because she had not been subjected to a "seizure" within the meaning of the Fourth Amendment.  The court then entered final judgment against Arthur without ruling on the sanctions motion.  This timely appeal followed.

## II.    ANALYSIS

### A.    Standard of review

We review the district court's grant of summary judgment de novo.  *Hunt v. Sycamore Cmty. Sch. Dist. Bd. of Educ.*, 542 F.3d 529, 534 (6th Cir. 2008).  "Summary judgment is proper when, viewing the evidence in the light most favorable to the nonmoving party, there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law."  *Thomas M. Cooley L. Sch. v. Kurzon Strauss, LLP*, 759 F.3d 522, 526 (6th Cir. 2014).  "The party moving for summary judgment carries the initial burden of showing the absence of a genuine dispute of material fact; if it satisfies that burden, the nonmoving party must show 'specific facts that reveal a genuine issue for trial.'"  *Marshall v. The Rawlings Co.*, 854 F.3d 368, 381 (6th Cir. 2017) (quoting *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014)).

A district court's treatment of a motion for discovery sanctions is reviewed under the abuse-of-discretion standard. *First Bank of Marietta v. Hartford Underwriters Ins. Co.*, 307 F.3d 501, 516 (6th Cir. 2002). "An abuse of discretion exists when the district court applies the wrong legal standard, misapplies the correct legal standard, or relies on clearly erroneous findings of fact." *First Tech. Safety Sys., Inc. v. Depinet*, 11 F.3d 641, 647 (6th Cir. 1993).

**B.      The district court correctly determined that Arthur was not subjected to a "seizure" within the meaning of the Fourth Amendment**

We begin with Arthur's argument that the district court erred in granting summary judgment on her excessive-force claim. "The Fourth Amendment protects individuals from unreasonable seizures, which includes those involving excessive force by law enforcement officers." *Guptill v. City of Chattanooga*, 160 F.4th 768, 776 (6th Cir. 2025). To survive summary judgment on such a claim, a plaintiff must present evidence sufficient to show (1) that she was subjected to "a 'seizure' within the meaning of the Fourth Amendment," and (2) that "any such seizure could be considered unreasonable by a jury." *Slusher v. Carson*, 540 F.3d 449, 454 (6th Cir. 2008). The primary issue in this appeal is whether Arthur has satisfied the first prong.

A person is seized when a government action "terminates or restrains his freedom of movement . . . through means intentionally applied." *Brendlin v. California*, 551 U.S. 249, 254 (2007) (citations and emphases omitted) (holding that a car's passenger, like the driver, was seized within the meaning of the Fourth Amendment during a traffic stop). This "can occur in one of two ways:  (1) use of force with the intent to restrain; or (2) show of authority with acquisition of control." *Campbell v. Cheatham Cnty. Sheriff's Dep't*, 47 F.4th 468, 476 (6th Cir. 2022) (citing *Torres v. Madrid*, 592 U.S. 306, 322 (2021)).

A seizure by force involves "the application of physical force to the body of a person with intent to restrain." *Torres*, 592 U.S. at 325 (holding that a fleeing suspect was seized by force when police shot her, even though she escaped and was not actually restrained). "Accidental force will not qualify[,] . . . [n]or will force intentionally applied for some other purpose." *Id.* at 317. "Moreover, the appropriate inquiry" for evaluating intent "is whether the challenged conduct *objectively* manifests an intent to restrain, for [courts] rarely probe the

subjective motivations of police officers in the Fourth Amendment context." *Id.* (emphasis in original).

A seizure by control, in contrast, "involves either voluntary submission to a show of authority or the termination of freedom of movement." *Id.* at 322. Such a seizure likewise requires an intent to acquire control. *See id.* at 321–22; *Brower v. County of Inyo*, 489 U.S. 593, 596 (1989) (holding that a "[v]iolation of the Fourth Amendment requires an intentional acquisition of physical control"). In addition, unlike seizures by force, "the officer must actually take control of" an individual, *Ward v. Brotzke*, 178 F.4th 966, 971–72 (6th Cir. 2026), such that the "person [is] stopped by the very instrumentality set in motion or put in place in order to achieve that result." *Torres*, 592 U.S. at 322 (quoting *Brower*, 489 U.S. at 599).

Arthur's principal argument is that she was seized by force when she was collaterally injured during Defendants' attempt to subdue Krause. In addressing this argument, the district court relied on the "so-called unintended-target" line of cases, which involve law-enforcement officers inadvertently using force on individuals who were not their intended targets. *See Kilnapp v. City of Cleveland*, 167 F.4th 909, 918–19 (6th Cir. 2026) (holding that an officer was seized when her partner fired his weapon at a suspect but inadvertently shot her). Examples include officers shooting bystanders, injuring hostages while attempting to apprehend hostage takers, stopping vehicles without realizing that they contain additional occupants, or deploying police canines that bite the wrong person. *Id.* at 918–20, 922–25 (collecting cases). But resolving Arthur's claim under this line of authority is not straightforward. As this court has recognized, the "nature of this body of law" is "confused" and has produced "divergent conclusions" among the courts. *Id.* at 922.

Arthur's claim is more easily and clearly rejected on different grounds: that Defendants lacked the necessary intent to restrain. The dispositive fact—and the one that distinguishes this case from the unintended-target cases described above—is that Defendants' use of force occurred during a training exercise rather than during an actual law-enforcement operation. Although no published decision of this court has squarely addressed this issue, the unpublished case of *Stewart v. City of Middletown*, 136 F. App'x 881 (6th Cir. 2005), does.

In *Stewart*, an officer alleged that he was unlawfully seized when another officer "fired either a rubber bullet or a foam ball" at him during a training exercise, permanently damaging his eye. *Id.* at 882. This court rejected the injured officer's excessive-force claim, holding that he "was not 'seized' or subjected to restraint within the meaning of the Fourth Amendment" because "he was accidentally injured during a training session," the shooting was not "intentional," and there was "no evidence to show that [the shooting officer's] actions were anything but negligent." *Id.* at 883. "To find otherwise," the court concluded, "would subject governmental entities to liability under Section 1983 virtually every time a state employee is injured in the workplace," which the court "w[ould] not do." *Id.*

Although *Stewart* predates the Supreme Court's decisions in *Brendlin* and *Torres*, it applied the same intent-to-restrain analysis described above. And a more recent published decision of this court endorsed *Stewart*'s rationale under that framework, albeit in dicta. *See Kilnapp*, 167 F.4th at 926. There, in describing the intent-to-restrain requirement, the court posited a hypothetical situation in which "a bystander [is] struck by a police officer's bullet fired while the officer is training at a shooting range." *Id.* Although "the officer fired their weapon intentionally," the court explained, "that is not sufficient to effect a seizure" because "[t]he objective circumstances in such an instance would rarely exhibit an intent to restrain." *Id.* *Kilnapp* thus reasons that force used during a training exercise does not reflect an intent to restrain, but rather an intent to practice or prepare.

Other circuits have reached similar conclusions. In *Gorman v. Sharp*, 892 F.3d 172, 173–75 (5th Cir. 2018), for example, the Fifth Circuit dismissed an excessive-force claim arising from a firearms-training demonstration where an instructor fatally shot another officer after mistakenly failing to replace his service weapon with a dummy firearm. The court held that no seizure had occurred because the shooting was not "'willful[ly]' performed" and the instructor's "only intention in pulling the trigger . . . was to educate his audience as a firearms training instructor," not to restrain anyone. *Id.* at 175 (first alteration in original) (quoting *Brower*, 489 U.S. at 596).

Earlier this year, the Fifth Circuit reaffirmed that principle in *Kennedy v. City of Arlington*, 165 F.4th 937, 943–45 (5th Cir. 2026). There, a police cadet died of cardiac arrest

following a self-defense training exercise where instructors subjected him to "various 'jiu-jitsu submission holds, choke holds, compression holds, punches and wrestling.'" *Id.* at 941. The court held that the instructors did not seize the cadet because they "did not intend to restrain or harm him," but rather "applied force to [him] for instructional purposes during a structured self-defense simulation." *Id.* at 944.

The Fourth Circuit has also ruled on this issue, albeit in an unpublished decision. In *Gray v. Kern*, 702 F. App'x 132, 134–35, 140–41 (4th Cir. 2017) (per curiam), the court rejected an excessive-force claim brought by a police trainee who was shot in the head by an instructor during a tactical training exercise. Although the court recognized that a genuine dispute existed as to whether the instructor intended to fire a live service weapon at the trainee, it noted that the shooting, which occurred during a training exercise, "was unconnected from any criminal justice objective." *Id.* at 141. The court therefore concluded that the shooting did not "implicate[] the protections of the Fourth Amendment" because "[t]he Supreme Court has recognized that '[t]he Fourth Amendment was tailored explicitly for the criminal justice system, and its balance between individual and public interests always has been thought to define the 'process that is due' for seizures of person or property in criminal cases.'" *Id.* at 140–41 (quoting *Gerstein v. Pugh*, 420 U.S. 103, 125 n.27 (1975)).

Applying these numerous precedents to this case, the result is clear: Arthur was not seized within the meaning of the Fourth Amendment because Defendants did not act with the necessary intent to restrain. Because the force at issue occurred during a training exercise, there is no genuine dispute that the "objective circumstances" demonstrate that Defendants' intent was to practice and prepare for hostage situations, not to actually subdue Arthur or anyone else. *See Kilnapp*, 167 F.4th at 926.

Arthur nevertheless argues that Defendants "manifested an intent to restrain" Krause because they "charged[ed]" at him in "a confined office with a shield and simultaneously grabb[ed his] leg." And, according to Arthur, so long as Defendants acted with the intent to restrain *someone*, any force applied to her as an unintended target constituted a seizure. *See Brendlin*, 551 U.S. at 254 (explaining that "an 'unintended person . . . [may be] the object of the detention,' so long as the detention is 'willful' and not merely the consequence of 'an unknowing

act'" (alteration in original) (quoting *Brower*, 489 U.S. at 596)).  But Arthur's argument ignores the key point that the Fourth Amendment concerns government actions taken in connection with the "criminal justice system."  *See Gray*, 702 F. App'x at 140 (quoting *Gerstein*, 420 U.S. at 125 n.27).  Because Defendants did not apply force to Krause during a law-enforcement operation, but instead only to train for hostage situations, their actions did not constitute a seizure by force within the meaning of the Fourth Amendment.  *See Torres*, 592 U.S. at 317.

In the alternative, Arthur contends that Defendants seized her by control through a "show of authority."  But this argument likewise fails for two reasons.  First, as explained above, Defendants lacked the intent necessary to effect a seizure by control because their actions were taken pursuant to a training exercise, not a genuine law-enforcement operation.  *See Torres*, 592 U.S. at 321–22; *Brower*, 489 U.S. at 596 (explaining that seizures by control require an intent to acquire physical control).

Second, Arthur fails to show that Defendants ever acquired "actual control" over her.  *See Torres*, 592 U.S. at 322 (explaining that "actual control is a necessary element for" seizures by control).  Actual control occurs when, "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that [s]he was not free to leave."  *Brendlin*, 551 U.S. at 255 (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)).

Arthur contends that "[a] squad of officers in extraction gear charging through a doorway into a confined office, wielding a shield and executing a forceful takedown, objectively communicates that anyone in that space is not free to move or evade."  But the record does not support that assertion.  To the contrary, the undisputed evidence shows that Arthur voluntarily agreed to participate in the training exercise, presumably giving her the ability to withdraw from it at any time.  Indeed, Arthur admits that Krause ended the exercise as soon as she cried out in pain, further confirming that the officers would have allowed her to leave if she so desired.  And Arthur's contention at oral argument that she was somehow compelled to take part because she was "instructed" and "ordered" by her supervisors is belied by her own briefing, which describes her participation as "voluntary."

As numerous out-of-circuit cases have persuasively held, such circumstances foreclose a claim of seizure by control. *See, e.g.*, *Kennedy*, 165 F.4th at 945 (finding no seizure by control where a police cadet "voluntarily submitted to [a] training simulation," there was no "plausibl[e] alleg[ation] that the instructors would have refused to stop the simulation if asked," and "the instructors *did* stop the simulation when [the cadet] could not continue" (emphasis in original)); *Feirson v. District of Columbia*, 506 F.3d 1063, 1068 (D.C. Cir. 2007) (finding no seizure by control where a police trainee "submitted to [an] exercise, and no evidence would support a finding that the instructors would not have stopped if [the trainee] asked them to do so"); *Fournier v. Reardon*, 160 F.3d 754, 757 (1st Cir. 1998) (finding no seizure by control where "no evidence presented would support a finding that [the plaintiff] was not free to leave at any point during [a training] scenario").

For all of these reasons, Arthur has failed to raise a genuine dispute that she was subjected to a seizure within the meaning of the Fourth Amendment. We accordingly find no error in the district court's grant of summary judgment on her excessive-force claim. This conclusion, however, should not be understood to foreclose any potential recovery for government employees who suffer workplace injuries like Arthur's. The most obvious source of relief would be a workers' compensation claim, which Arthur conceded at oral argument was in fact successfully pursued.

**C.      Any error arising from the district court's failure to rule on Arthur's sanctions motion before granting summary judgment was harmless**

We turn next to Arthur's argument that the district court abused its discretion by granting summary judgment in favor of Defendants without first ruling on her motion for sanctions based on VanderWeele's alleged evidentiary misconduct. Even assuming, without deciding, that the court did abuse its discretion, we conclude that any error was harmless.

Arthur sought three types of sanctions for VanderWeele's alleged spoliation of evidence and false deposition testimony: (1) an adverse-inference instruction, (2) the striking of VanderWeele's pleadings and a default judgment against him, and (3) an award of attorney fees and costs. As an initial matter, Arthur's appellate briefs fail to address her third request for attorney fees and costs, so that issue is forfeited on appeal. *See Scott v. First S. Nat'l Bank*, 936

F.3d 509, 522 (6th Cir. 2019) ("[A]n appellant forfeits an argument that [s]he fails to raise in h[er] opening brief.").

Her second request for the striking of VanderWeele's pleadings and a default judgment against him likewise fails because such a sanction would be grossly disproportionate to the alleged misconduct at issue: VanderWeele's spoliation of certain communications with Setzer, an unrelated prison employee, and his subsequent communications with Setzer regarding deposition testimony. As this court has consistently held, a default judgment for "failure to cooperate in discovery is a sanction of last resort" and is inappropriate if "less drastic sanctions" are available. *Bank One of Cleveland, N.A. v. Abbe*, 916 F.2d 1067, 1073 (6th Cir. 1990) (quoting *Reg'l Refuse Sys., Inc. v. Inland Reclamation Co.*, 842 F.2d 150, 153–55 (6th Cir. 1988))).

This leaves Arthur's first request for an "adverse inference instruction that the destroyed evidence would have been unfavorable to Defendant VanderWeele." But even if the district court had granted that request, the summary-judgment analysis would remain unchanged. As explained above, the dispositive fact is that Arthur's injuries occurred during a voluntary training exercise rather than during a genuine law-enforcement operation. That fact is undisputed, and no adverse inference concerning VanderWeele's communications with Setzer could change that reality. Accordingly, Defendants would be entitled to summary judgment regardless of whether the district court granted Arthur's requested sanction. We therefore need not disturb the court's summary-judgment order because any possible error regarding the sanctions motion was harmless. *See* Fed. R. Civ. P. 61 (providing that "errors and defects that do not affect any party's substantial rights" are not "ground[s] for . . . vacating, modifying, or otherwise disturbing a judgment or order").

### III. CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.